[No. 15919.   Department Two.—April 5, 1895.]

## ELIZABETH A. HOWE, Respondent, v. J. R. JOHNSON, Appellant.

Sale—Statute of Frauds—Want of Immediate Delivery—Finding Against Evidence.—Where an alleged sale of personal property was not accompanied by an immediate delivery of the property, as required by section 3440 of the Civil Code, the sale is conclusively presumed to be fraudulent and void as against an attaching creditor, and a finding that the plaintiff was the owner of the property by virtue of the sale is not justified by the evidence.

Id.—Sale of Farming Property—Constructive Possession.—Where the property in controversy was sold by a father to his daughter, and consisted

of an undivided-third part of certain farming utensils, farm products, and livestock, situated at the time of the alleged sale on a farm owned in common by the daughter, father, and a brother of the father, and the father and his brother conveyed by deed to the daughter the entire farm, and verbally sold all their interest in the personal property to the daughter, who at the time of the sale was residing at her father's residence on other premises, and did not receive actual possession either of the farm or of the personal property, the other cotenants making the transfer being then in actual possession of both, and working on the farm and using the personal property, the fact that the daughter received constructive possession of the personal property by a conveyance of the farm does not constitute such immediate delivery and actual and continued change of possession as is required by the statute of frauds.

ID.—TITLE TO PRODUCE OF LAND AFTER CONVEYANCE.—Where the transfer of the farm was not actually fraudulent and void as having been made to delay or defeat creditors of the grantors the grantee is entitled to receive the produce of the farm raised after the date of the conveyance; and such produce cannot be attached by a creditor of one of the grantors.

ID.—EFFECT OF CONVEYANCE TO DEFRAUD CREDITORS.—If the conveyance was intended by the grantors to defraud their creditors, and the grantee did not purchase in good faith for a valuable consideration and without notice of intended fraud, the conveyance should be held void as against all persons who were creditors of the grantors at the date of the conveyance; and in that case the subsequent produce of the land would be subject to execution against the grantors.

ID.—TROVER AGAINST SHERIFF—PLEADING—FRAUD AGAINST CREDITORS. In an action of trover against the sheriff, who has seized personal property at the suit of a creditor of a grantor of the plaintiff, where there is no indication in the complaint that the plaintiff claims title by sale from the defendant in the execution, the sheriff is not bound in his answer to anticipate such title, and is not bound to plead any fraud, actual or constructive, in the sale.

APPEAL from a judgment of the Superior Court of Mendocino County and from an order denying a new trial.

The facts are stated in the opinion.

*J. A. Cooper,* and *J. M. Mannon,* for Appellant.

Possession must have been taken of the property and the owner excluded therefrom before this action will lie. (Waterman on Trespass, sec. 484; *Wright* v. *Ward,* 65 Cal. 527; *Herron* v. *Hughes,* 25 Cal. 555; *Mersereau* v. *Norton,* 15 Johns. 179; *Goode* v. *Longmire,* 35 Ala. 668; 76 Am. Dec. 309; *Bradley* v. *Keese,* 5 Cold. 223; 94 Am.

Dec. 246.) The attempted sale of the personal property, if made either February 1st or March 11th, was not followed by an immediate delivery and an actual and continued change of possession, and, therefore, the sale was void as to Mrs. Blair, who was then a creditor. (Civ. Code, sec. 3440; *Watson* v. *Rodgers,* 53 Cal. 401; *Edwards* v. *Sonoma Valley Bank,* 59 Cal. 148; *Stevens* v. *Irwin,* 15 Cal. 505; 76 Am. Dec. 500; *Bunting* v. *Saltz,* 84 Cal. 170; *Woods* v. *Bugbey,* 29 Cal. 467; *Regli* v. *McClure,* 47 Cal. 613; *Gray* v. *Corey,* 48 Cal. 208.) The fact of the deed being made to the real estate did not draw to the grantee the possession of all upon the land. In fact, the deed might be made to one and the right of possession remain in another. (*Grum* v. *Barney,* 55 Cal. 254; *Dorman* v. *Soto* (Cal., April 9, 1894), 36 Pac. Rep. 588; *Cahoon* v. *Marshall,* 25 Cal. 197; *Bunting* v. *Saltz,* 84 Cal. 168.)

*T. L. Carothers,* and *G. A. Sturtevant,* for Respondent.

The acts of the defendant amounted to a conversion of the property, and he is liable to the plaintiff for the value of the property. (*Rankin* v *Ekel,* 64 Cal. 446; *Neff* v. *Thompson,* 8 Barb. 215; Waterman on Trespass, sec. 484; Freeman on Cotenancy and Partition, secs. 214, 215; *Brown* v. *Pratt,* 4 Wis. 513; 65 Am. Dec. 330; *Goode* v. *Longmire,* 35 Ala. 668; 76 Am. Dec. 309; *Davidson* v. *Waldron,* 31 Ill. 120; 83 Am. Dec. 206; *Bradley* v. *Keese,* 5 Cold. 223; 94 Am. Dec. 246; Freeman on Executions, secs. 260, 261, *Hibbard* v. *Zenor,* 75 Iowa, 471; 9 Am. St. Rep. 497; *Sawyer* v. *Bray,* 102 N. C. 79; 11 Am. St. Rep. 713.) There was such a delivery and continued and actual change of possession as to make the sale of the property good as against creditors of Montgomery Howe. (*Williams* v. *Lerch,* 56 Cal. 334; *O'Gara* v. *Lowrey,* 5 West Coast Rep. 417; *Stevens* v. *Irwin,* 15 Cal. 507; 76 Am. Dec. 500; *Lay* v. *Neville,* 25 Cal. 553; *Godchaux* v. *Mulford,* 26 Cal. 323; 85 Am. Dec. 178; *Hesthal* v. *Myles,* 53 Cal. 623; *Humphreys* v. *Harkey,* 59 Cal.

626; *Ford* v. *Chambers,* 28 Cal. 13; *Gould* ⋎ *Huntley,* 73
Cal. 399.)

VANCLIEF, C.—Action of the nature of the common-
law action of trover to recover damages for an alleged
wrongful taking and conversion of personal property.

At the time of the alleged taking the defendant was
sheriff of Mendocino county, and in his answer alleges
that he was justified in taking the property by virtue of
an execution issued to him on a judgment against Mont-
gomery Howe (plaintiff's father) in favor of Phœbe
Blair, and denies that plaintiff was the owner of the
property so taken, or entitled to the possession thereof.

The cause was tried by the court, whose judgment
was in favor of plaintiff for the sum of fifteen hundred
and twelve dollars, with interest and costs. Defendant
appeals from the judgment and from an order denying
his motion for a new trial.

The plaintiff claimed title to the property by an al-
leged sale thereof from her father, Montgomery Howe.

Appellant makes the point that the sale was fraud-
ulent and void as against the creditors of Montgomery
Howe, because not accompanied by an immediate de-
livery and followed by an actual and continued change
of possession of the property, and that the finding to
the contrary by the court is not justified by the evi-
dence.

The property in question consists of one-third un-
divided part of certain farming utensils, farm produce,
and livestock, situate at the time of the alleged sale to
plaintiff on a farm in Mendocino county, known as the
" Clay ranch." On March 14, 1893, the ranch and all
said personal property thereon was owned in equal parts
by Montgomery Howe, Samuel Howe, and Mrs. Given.
On that day Montgomery Howe and Samuel Howe
(brothers) conveyed by deed all their interests in the
ranch, and verbally sold all their interests in said per-
sonal property to the plaintiff. At the time of sale the
plaintiff was at her father's residence in Oakland where

she also resided, and the business of the sale on her part was transacted on the Clay ranch by her agent, Frank Teichman, whom she was then engaged to marry. Teichman did not receive possession of either the ranch or the personal property at the time of the sale, though the Howe brothers were then in actual possession of both, and were working on the ranch and using the personal property. Immediately after the execution of the deed for the land Teichman recorded it in Mendocino county, and returned to Oakland, whence he had been sent by plaintiff, and there delivered the deed to her. The only consideration for the deed for the land and the sale of the personal property was the personal services of plaintiff in keeping house for her father, as to which she testified as follows:

"I made the contract with my father for wages when I was thirteen. The woman he had working left, and I told him I would do the work if he would pay me. During the first year he paid me sometimes three dollars, sometimes four dollars, not the full amount. I kept no memorandum of it; could not tell how much he paid me. He bought my clothes and boarded me. I was to receive five dollars a month for a time. Occasionally he gave me as much as five dollars per month. This continued until I was eighteen. When I was eighteen I was to get more. No sum was stipulated, but a different contract was made. My father said: ' When I am able I will pay you.' At the time the ranch and personal property were conveyed to me the value fixed was a little over five thousand dollars—about five thousand five hundred dollars. There was an agreement made to pay me so much a year for the time that I had worked—one thousand dollars a year. The ranch was valued at five thousand five hundred dollars. My uncle had been on the ranch in charge of the personal property since February, 1891, and my father since July, 1891, but father was there only a portion of the time. I was in Oakland when the deed was made. My father

and uncle were both up on the ranch in charge of the property."

She testified further that: " Besides the deed to the ranch and personal property my father gave me a note for seven thousand five hundred dollars. That made thirteen thousand dollars—a note for seven thousand five hundred dollars and five thousand five hundred dollars' worth of property. That was the way I accepted it at the time." And also testified as follows: " It was in the agreement when I took the ranch and personal property from my father and uncle that they should stay and help me out for a time. I did not understand farming. They agreed to stay on the place and help me out. That was the contract. My uncle, Samuel Howe, was to receive fifty dollars per month, and my father was to receive fifty dollars per month. They continued to work on the place, and I afterward paid them their wages. They were both busily engaged on the ranch, and it was a part of the agreement with them that they should have such employment. Under this agreement I purchased a two-thirds' interest in this personal property and in the ranch. Mrs. Given owned the other undivided one-third interest."

Between the day of the sale (March 14th) and April 1st, that is from ten to seventeen days after the sale, plaintiff again sent Mr. Teichman to the ranch as her agent with written instruction to take possession for her of the personal property and the ranch, which he assumed to do by remaining on the ranch directing the work and doing a part of it until about June 1st, when he went to Oakland and brought plaintiff to the ranch; and thereafter, until the personal property was levied upon by the sheriff, he and plaintiff formally directed the work, kept the books, employed and paid the help, bought supplies and sold whatever of the property that was sold. But during all that time the Howe brothers lived and worked on the ranch the same as before Teichman took possession. As to this Samuel Howe testified: "After Mr. Teichman came there my brother and I

worked on the ranch just the same as we did before,
except that after Mr. Teichman came up we had a boss;
previous to that I was boss.   After that I was the servant.
. . . . Sometimes my views were asked about running
the place, but I had no authority." The testimony of
plaintiff and Samuel Howe was fully corroborated by
Montgomery Howe, but none of them could remember
any definite agreement between the father and daughter
as to what wages he was to pay her for her services, or
how much he had paid her 'before the sale in question.
No accounts were ever kept between them.  He testified:
" My wife died in 1876.  Some time after my wife died
my housekeeper talked of going away.  The plaintiff
and my eldest daughter came into the office and they
said they would do the work, and it should not cost any
more than it did to hire housekeepers.  I told them all
right. . . . . They were to receive pay, but how much
we agreed to pay them I do not remember now.  I sup-
pose we intended to pay them what it was reasonably
worth.  They did the work ever since that time.  My
oldest daughter is now dead; she has been dead some
six or seven years.  After plaintiff became of age I
had a conversation with her.  I do not remember
how much I was to pay.  I do not remember that we
set any definite price.  I cannot tell how long after
she became eighteen years of age that her employment
continued. . . . . I think the services were reasonably
worth from fifty to one hundred dollars per month.
. . . . When my wife died plaintiff was eight or nine
years old.  My family consisted of three daughters and
one son and a housekeeper.  The plaintiff went to school
until she was eighteen and I wished her to go to school
longer.  I furnished her with clothes and sent her to
school, and she kept house and worked there.  Q. You
say no particular arrangement was made?  A. I do not
recollect any set sum.  Q. You do not recollect any par-
ticular time that you made any express bargains?  A.
They came to the office and told me what they would
do; they would talk to me.  I would agree to it.  Q.

Did you pretend to keep any account of the money you gave them? A. No, sir. I think sometimes they told me for so long a time they had had so much money. Q. Did you make any different arrangements with this daughter to what you had with your older daughter? A. My recollection is that she came in and talked with me sometimes, but I do not recollect what it was. I was not very particular." .

The plaintiff testified that both her father and uncle agreed to pay her for housekeeping, though it does not appear that her uncle was a member of the family. But there is no evidence that her uncle so agreed until about the time of the sale in March, 1893. As to this he testified as follows:

"About the month of March, 1893, myself and my brother made a sale of the personal property to the plaintiff, who is my niece and my brother's daughter. We made that sale for services that were rendered in keeping house for a goodly number of years. My brother and I were partners in business in the railroading business in Oakland. I think plaintiff's services commenced two or three years after her mother's death. At the time we made the agreement we let her have the ranch and the personal property, and we gave her notes at the same time for seven thousand five hundred dollars, in payment of the services she had rendered, and in full of those services — I think for about thirteen years' services. We sold her all our right, title, and interest in the 'Clay ranch,' and the personal property on the ranch. We owned a two-thirds' interest and Mrs. Given owned the other one-third. When we made the deed we delivered it to Mr. Teichman, the agent of plaintiff, at Hopland. That was at the time the sale of the personal property went into effect. Plaintiff asked me to continue on the ranch, and my answer was, 'I would stop for a time.' There was no agreement at that time about our wages, but there was afterward. . . . . I knew very well that after my brother's wife died that the children had to be paid from the very start — I

mean the plaintiff and her older sister. I do not know that we have agreed with her as to the rate of wages. We have put her off, and have never paid her for her services. It was all the time implied that she was to receive pay. I cannot say when was the first time that we had a talk with plaintiff about settling with her. It must have been about the commencement of the year 1893. At the time the deed was made my brother and I had talked over the matter, but I do not know whether we had talked with plaintiff about it or not. I cannot say when was the first time I talked with her about it. I think I had a talk with her before Mr. Teichman came up to take possession of the property, but I don't know."

It thus appears by her uncle's estimate that plaintiff was allowed, in addition to her personal expenses, board, and schooling, one thousand dollars a year from the time she was about twelve years of age; for she testified at the trial that she was then (February 15, 1894, eleven months after the sale), only twenty-six years of age. But she estimated the value of her services at only thirty dollars per month after she was eighteen years of age, and at only five dollars a month before.

It clearly appears from the evidence that the alleged sale was not accompanied by an immediate delivery of the property, as required by section 3440 of the Civil Code. On this point there is no conflict of evidence. The plaintiff, her father, her uncle, and Mr. Teichman, all testified that the sale of the personal property was made on March 14, 1893, at the same time the deed of the ranch was executed, and that the Howe brothers were then in actual possession of both the real and personal property; and also that there was no attempt to deliver to plaintiff the personal property until about two weeks after the sale. It follows that the sale is conclusively presumed to be fraudulent and void against Phœbe Blair, who is admitted to have been a creditor of Montgomery Howe at the time of the sale; and consequently, the finding that plaintiff was the owner of the property by virtue of that sale is not justi-

fied by the evidence. (*Cahoon* v. *Marshall*, 25 Cal. 201; *Bell* v. *McClellan*, 67 Cal. 283; *Newell* v. *Desmond*, 63 Cal. 243; *Bunting* v. *Saltz*, 84 Cal. 168; *Etchepare* v. *Aguirre*, 91 Cal. 288; 25 Am. St. Rep. 180; *Murphy* v. *Mulgrew*, 102 Cal. 547; 41 Am. St. Rep. 200.)

The only attempted answer by respondent's counsel to this view of the case is, that at the time of the sale Mrs. Given was a tenant in common of one-third of the property; that, upon the sale of the other two-thirds to plaintiff, Mrs. Given's possession became plaintiff's possession by construction of law, and that such constructive possession of plaintiff satisfied the requirement of immediate delivery. As authority for this counsel cites Freeman on Cotenancy, section 167, which cites and seems to rest upon *Brown* v. *Graham*, 24 Ill. 630, alone. But the Illinois case is not in point. The decision in that case is fully expressed in the syllabus as follows: " The possession of one of several tenants in common of personal property which is incapable of division is constructive possession of all. And when a tenant in common, not in possession, sells his interest the possession of another tenant in common becomes the constructive possession of the purchaser."

And this was held in that case to satisfy the statute of frauds.

Conceding, for all purposes of this appeal, that a constructive possession thus acquired would satisfy section 3440 of our Civil Code, which, in view of the decisions of this court in *Newell* v. *Desmond, supra,* and *Bunting* v. *Saltz, supra,* seems extremely doubtful, still the Illinois case is not applicable, for the reason that the Howe brothers were in actual possession at the time they sold to plaintiff, and there is no evidence that Mrs. Given was ever in actual possession. (*Brown* v. *O'Neal*, 95 Cal. 262; 29 Am. St. Rep. 111.)

The evidence shows that a portion of the property in question was produce of the ranch during 1893, after the sale, and, therefore, not the identical property sold,

the value of which is shown to be $627.61; and it is claimed that respondent is entitled to recover this sum, even though the sale of the personal property should be held void.

If the conveyance of the ranch was not void against creditors on the ground of actual fraud, I think this point well taken. While the evidence tends to prove that the conveyance of the ranch was actually fraudulent, as having been made to delay or defeat creditors of the vendors, it cannot be held that there was not such a conflict of evidence on this issue as to justify the finding of the court.

Should it be found on a new trial, however, that the conveyance of land was intended by the vendors to defraud their creditors, and that plaintiff did not purchase in good faith for a valuable consideration, and without notice of the intended fraud, then such conveyance should be held void as against all persons who were creditors of the vendors at the date of the conveyance; and, in that case, the produce of the land during 1893, under the circumstances of this case, should be held subject to the execution by virtue of which the defendant took it.

The answer contains no allegation of fraud, actual or constructive; nor was such allegation necessary; for since there was no indication in the complaint that plaintiff claimed title by sale from her father and uncle, the defendant was not bound to anticipate that she would do so. (*Grum* v. *Barney*, 55 Cal. 254.) But now that defendant has notice of the nature of plaintiff's alleged title it may be questionable whether he should expressly plead the fraud on which he relies for his defense before the new trial.

I think the judgment and order should be reversed and the cause remanded for a new trial, with leave to defendant to amend his answer if so advised.

HAYNES, C., and BELCHER, C., concurred.

For the reasons given in the foregoing opinion the judgment and order are reversed and the cause remanded for a new trial, with leave to defendant to amend his answer if so advised.

McFarland, J., Temple, J., Henshaw, J.